## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KATIE ALVAREZ,<br><br>on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br>vs.<br><br><br>APPLE, INC.,<br><br>        Defendant. | Case No.: 1:23-cv-1752<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Katie Alvarez ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this Class Action Complaint against Apple, Inc. (hereinafter "Apple" or the "Defendant"), and alleges, upon personal knowledge as to her own actions and her counsels' investigation, and upon information and belief as to all other matters, as follows:

### I. INTRODUCTION

1.      Apple harvests data from its customers' iPhones and other consumer personal computing devices [such as iPads, Macs using apps from the Apple "App Store," etc.]. That data, hereinafter referred to as "User Information" or "UI" is harvested in a manner which violates state consumer deceptive practice and advertising laws, constitutes federal and state trespass of a computer or device, and involves beaches of various equitable principles and of the common law.

2.      Apple records vast amounts of User Information without the consent or even the knowledge of Plaintiff, from all of its consumer computing devices that can utilize "apps" from its online App Store.

3.      UI is, in fact collected, stored, and maintained by Defendant to, *inter alia*, sell

targeted advertisements to third parties that are specifically targeted at various demographics. Given the way that consumers access Apple devices, that UI includes biometric information including fingerprints and facial scans.

4.      The mechanisms through which Apple commits violations are technical and complicated; the essence is a very simple idea: for all of Apple's promises about how private your iPhone is, the company vacuums up a lot of data about consumers without permission, even when it says customers can opt out, and even when it says it is not doing so.

5.      Plaintiff brings this action on behalf of all persons whose UI was harvested, acquired, and/or misappropriated because of Defendant's surreptitious and unauthorized access of such user information.

6.      Defendant's conduct amounts to breach of implied contract, violation of federal and state criminal computer trespass statutes, potentially including the Computer Fraud and Abuse Act of 1986 (CFAA), 18 USC § 1030 (a)(2)(B).[1]

7.      Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully accessing, recording, harvesting, and storing user actions, activities, inputs and other metadata and for future financial gain.

## II. JURISDICTION AND VENUE

8.      This Court has original jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Class, defined below,

---

[1] Any government official using an Apple device is using a "protected computer" as defined in 18 USC § 1030(e)(2), and access violates federal statutes.

at least one of which is a citizen of a different state than Defendant. Defendant is a citizen of California, where it maintains its principal place of business; Plaintiff is a citizen of New York.

9.      This Court has personal jurisdiction over Defendant because Defendant is found within this District, maintains a multitude of retail stores in this District, avails itself to the stock and Defendant markets in this District, and conducts substantial consumer business in this District.

10.      Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant raises capital in the financial markets in this judicial district, and Defendant regularly transacts business in this District with consumers of New York state living in this district, and a substantial part of the events giving rise to this Complaint arose in this District.

### III. PARTIES

11.      Plaintiff Alvarez is a resident of Nassau County and a citizen of the State of New York. Plaintiff Alvarez is a current iPhone customer and has bought several successive iPhones.

12.      Plaintiff Alvarez was never notified by Apple of its collection of User Information.

13.      Plaintiff Alvarez bought her iPhone at a price premium to phones by other makers.

14.      Defendant Apple is a corporation organized under the laws of California, and its American headquarters and principal place of business located at One Apple Park Way, Cupertino, CA 95014.

15.      Defendant Apple does substantial business in New York and intentionally and continuously sells to New York consumers.

16.      Defendant Apple's latest SEC Form 10-K filing states that Apple common stock is listed on the NASDAQ Stock Exchange under the symbol "AAPL" and its shares have an aggregate value of $2,830,067,000,000.

17.     Defendant Apple avails itself of the debt markets in New York. Apple raises capital through debt instruments in New York markets on NASDAQ and New York investment banks.

18.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

19.     All of Plaintiff's claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## IV. FACTUAL ALLEGATIONS

### *Background*

20.     Apple describes itself as a company which "designs, manufactures and markets smartphones, personal computers, tablets, wearables and accessories, and sells a variety of related services."

21.     Apple's reported revenue for 2022 was almost $400 billion.

22.     Apple itself notes its advertising efforts in its Annual Report (hereinafter Form 10-K) and describes its business as follows: "Advertising - The Company's advertising services include various third-party licensing arrangements and the Company's own advertising platforms."[2]

23.     Apple further notes that net sales of services, in which Apple includes its advertising, have seen steadily rising profits year over year.

---

[2] Apple, Inc. (n.d.). *Apple, Inc. Form 10-K For the Fiscal Year Ended September 24, 2022* (Oct. 27, 2022), Inline XBRL Viewer, *available at* https://www.sec.gov/ix?doc=%2FArchives%2Fedgar%2Fdata%2F320193%2F00003201932200 0108%2Faapl-20220924.htm (last visited Feb. 28, 2023).

24.     Apple's Form 10-K notes that ads and services are now more profitable than the sales of Macs and iPads combined.[3] It further states that for 2022 "[t]otal net sales increased 8% or $28.5 billion during 2022 compared to 2021, driven primarily by higher net sales of iPhone, Services and Mac."

### Defendant's Privacy Policies vs. Data Collection

25.     On its customer-facing website, Defendant has a posted Privacy Policy (the "Privacy Policy").[4] The header for the Privacy Policy is "Privacy. That's Apple."

26.     The Privacy Policy trumpets that "Privacy is a fundamental human right. It's also one of our core values."[5]

27.     Plaintiff and Class Members have been injured by the harvesting, collection, storage, and sale of their User Information.

28.     It appears that Apple, like nearly all other web advertisers, collects demographic information to target specific advertising to consumers, i.e., ads that are specifically served to only an audience that will be most receptive to the message and/or are the most attractive to advertisers.

29.     What this means is that Apple collects behavioral and demographic data from its entire base of consumer computing hardware users in order to allow Apple to target advertising to its users using specific demographic data, inferred interests, and browsing context.  This targeting brings in more revenue than non-targeted advertising.

30.     Apple also collects biometric data as part of its collection of information, including

---

[3] *Id.* at 21 ("Products and Services Performance" net sales including ads were $78,129,000,000; net sales of iPads were $29,292,000,000; net sales of Macs were $40,177,000,000).

[4] Apple, Inc., *Privacy* (no date), https://www.apple.com/privacy/ (last visited Feb. 28, 2023).

[5] *Id.*

retina or iris scans, fingerprints, voiceprints, and/or scans of hand or face geometry.  For example, a person accessing their iPhone may do so via facial scan or fingerprint, or hand or facial geometry scans.

31.     There are reasons for Apple to engage in this targeted advertising beyond the obvious pecuniary gain.

32.     By collecting all information from all devices, through automated means, Apple can pair this data for every user transaction with unique device identifiers and also with other Apple products, including iCloud and AppleCare.

33.     By combining all of Defendant's services (AppleTV and iTunes, AppleCare, ApplePay, and AppleCare) the number of individual transactions stored verges upon the unimaginable.

34.     Apple has amassed an undreamed-of amount of discrete and uniform User Information.  In collecting this data, Apple is acting consistent with an understanding that theglobal big data and business analytics (BDA) market was valued at $168.8 billion U.S. dollars in 2018 grew to $215.7 billion by 2021.[6]

35.     Shoshana Zuboff, professor emerita at Harvard Business School, calls this trend of big data "surveillance capitalism." Professor Zuboff defines surveillance capitalism as follows:

> [S]urveillance capitalism as the unilateral claiming of private human experience as free raw material for translation into behavioral data. These data are then computed and packaged as prediction products and sold into behavioral futures markets — business customers with a commercial interest in knowing what we will do now, soon, and later. It was Google that first learned how to capture surplus behavioral data, more than what they needed for services, and used it to

---

[6] Petroc Taylor, *Big Data and Business Analytics Revenue 2022*, Statista (Aug. 26, 2022), https://www.statista.com/statistics/551501/worldwide-big-data-business-analytics-revenue/ (last visited Feb. 28, 2023).

compute prediction products that they could sell to their business customers, in this case advertisers.[7]

36.    In 2019, Apple posted a sign outside the Consumer Electronics Show, an annual trade show hosted  by the Consumer Technology Association held in January every year in Las Vegas, that covered an entire side (about 15 stories) of the Springhill Suites Marriot hotel building, showing the outline of an iPhone and the URL of the Apple Privacy Policy, that advertised, "What happens on your iPhone stays on your iPhone":[8]



37.    Plaintiff and Class Members have taken reasonable steps to maintain the

---

[7] John Laidler, *Big Tech is Watching You*, Harvard Gazette (Mar. 4, 2019),
https://news.harvard.edu/gazette/story/2019/03/harvard-professor-says-surveillance-capitalism-is-undermining-democracy/ (last visited Feb. 28, 2023).
[8] Chris Velazco, Tech Reporter for the Washington Post (Jan. 4, 2019),
https://twitter.com/chrisvelazco/status/1081330848262062080/photo/1 (last visited Feb. 28, 2023).

confidentiality of their User Information and personal privacy, and Apple understands that value enough to advertise to consumers accordingly, and to make bold and unequivocal claims about Apple's protection of personal privacy and UI.

38.      iPhones and all Apple apps are advertised as "minding their own business."  Apple states, in bold letters and bright colors, hat "Safari throws trackers off your trail," "Health keeps your records under wraps," "Messages are only seen by who you send them to," "Siri learns what you need. Not who you are."[9]

39.      Defendant acquired, collected, and stored Plaintiff's and Class Members' User Information for financial gain. In selling its hardware and services to consumers, Apple has consistently assured consumers in its advertising that user privacy was assured.

40.      Consistent with these promises, Apple's IOS software on an iPhone has screens that purport to allow the user to do what Apple claimed to be doing all along: not sharing User Information.

41.      The screens titled "Analytics and Improvements" and most tellingly, "Tracking" supposedly allow the user to turn off these intrusions.

***Apple's Harvesting Data***

42.      It has come to light that while Apple touts privacy, it values profits more.

43.      The website Gizmodo broke a story that despite allowing the user to "switch on" privacy protection, that protection was illusory. "According to a new report by independent researchers, though, Apple collects extremely detailed information on you with its own apps even

---

[9] *Id. supra* note 4.

when you turn off tracking, an apparent direct contradiction of Apple's own description of how the privacy protection works."[10]

44.     The article notes that "[t]he iPhone Analytics setting makes an explicit promise. Turn it off, and Apple says that it will 'disable the sharing of Device Analytics altogether.'" Despite this promise, however, when researchers looked at "the data collected by a number of Apple iPhone apps—the App Store, Apple Music, Apple TV, Books, and Stocks," those researchers found that "the analytics control and other privacy settings had no obvious effect on Apple's data collection—the tracking remained the same whether iPhone Analytics was switched on or off."[11]

45.     Other regulators have already begun investigating Apple's practices and levying fines because of the obvious harm to consumers.  For example, the French data regulating agency fined Apple $8.5 million in January 2023 for "illegally harvesting iPhone owners' data for targeted ads."[12]  In assessing the fine, French regulators released a statement that they had discovered that iPhones were capturing user data, even to the amount of time a user stayed on the same screen.[13]

**Value of Targeted Advertising**

---

[10] Thomas Germain, *Apple is Tracking You Even When Its Own Privacy Settings Say It's Not, New Research Says*, Gizmodo (Nov. 8, 2022), https://gizmodo.com/apple-iphone-analytics-tracking-even-when-off-app-store-1849757558 (last visited Feb. 28, 2023).
[11] *Id.*
[12] Thomas Germain, *Apple Fined $8.5 Million for Illegally Collecting iPhone Owners' Data for Ads*," Gizmodo (Jan. 4, 2023), https://gizmodo.com/apple-iphone-france-ads-fine-illegal-data-1849950163 (last visited Feb. 28, 2023).
[13] Commission Nationale de l'Informatique et des Libertés, *Identifiant Publicitaire: Sanction de 8 millions d'euros à l'encontre de Apple Distribution International* (Jan. 4, 2023), https://www.cnil.fr/fr/identifiant-publicitaire-sanction-de-8-millions-deuros-lencontre-de-apple-distribution-international (last visited Jan. 12, 2023).

46.     Advertisers or Sellers pay for ads on a Social Media Platform ("SMP") like Google or Facebook per ad shown to a user (per "impression"). If that user has no interest in the wares of the Seller, then that ad impression money was wasted in the eyes of the seller.

47.     SMP have learned that Sellers will pay more for impressions they have reason to believe are likely to buy. Because SMPs have vast stores of UI, SMPs could sell impressions that can be categorized by keywords of interests and demographics of users, so called "targeted" ads. SMPs use an auction like system called the "Vickrey Clarke Groves procedure." Sellers bid on the actual user "clicks" of various demographics, and SMPs sell to the higher bidder.

48.     Therefore, it is in the best interests of the bidders to bid highly for ads that are placed strategically to reach people who are likely to buy the product they sell. In other words, VCG bidding encourages targeted advertising. As Facebook collects our data, it determines which ads we are more likely to click on, thus increasing the value of those ads for advertisers. It then sells them grouped by number of clicks.[14]

49.     A study by the Economics Department at the University of Copenhagen gave an example: "An example of a keyword is 'andelsvurderinger' [Danish for 'cooperative assessments'] in the Danish market of Facebook. The average cost per click is 7,56 DKK. This can specify any add for exactly this query and advertise to potential value customers due to the interest."[15]

---

[14] Cornell Course Blog, *Selling Keywords, Targeted Advertising, and The Social Dilemma: Networks Course blog for INFO 2040/CS 2850/Econ 2040/SOC 2090* (Nov. 1, 2022), https://blogs.cornell.edu/info2040/2022/11/01/selling-keywords-targeted-advertising-and-the-social-dilemma/ (last visited Feb. 28, 2023).
[15] Alexander Leo-Hansen, *How is the VCG mechanism profiting Facebook?*, ResearchGate (June 2020), https://www.researchgate.net/publication/345818075_How_is_the_VCG_mechanism_profiting_Facebook (last visited Feb. 28, 2023).

50.     While seemingly miniscule, the practice has netted fortunes. Facebook relies almost entirely on it: "Our advertising revenue is dependent on targeting and measurement tools that incorporate data signals from user activity on websites and services that we do not control, and changes to the regulatory environment, third-party mobile operating systems and browsers, and our own products have impacted, and we expect will continue to impact, the availability of such signals, which will adversely affect our advertising revenue."[16]

51.     Meta, Facebook's parent company, reported advertising revenue of $69.66 billion for 2019, up 27% year-over-year. And as noted above, Apple's ads contribute billions to its profits, far more than device sales themselves.

## V. CLASS ALLEGATIONS

52.     Plaintiff brings this Nationwide class action on behalf of herself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, and other applicable law, and a New York State resident subclass for the consumer claims specific to New York.

53.     The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All Nationwide residents whose User Information was actually or potentially accessed, collected, or acquired by Defendant as part of its software and hardware Analytics and Tracking **(the "Nationwide Class")**.

54.     The New York State resident subclass that Plaintiff seeks to represent is defined as follows:

> All New York State residents whose User Information was actually or potentially accessed, collected, or acquired by Defendant as part of its software and hardware Analytics and Tracking **(the "New York State Class")**.

---

[16] *SEC filings details*. Meta - Financials - SEC Filings Details. (n.d.). Retrieved January 13, 2023, from https://investor.fb.com/financials/sec-filings-details/default.aspx?FilingId=13872030

55.     The Nationwide Class and New York State Class are collectively referred to as the "Classes."   Excluded from the putative Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members and staff members.

56.     Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate based on facts to be developed during discovery.

57.     This action is brought and may be maintained as a class action because there is a well-defined community of interest among many persons who comprise a readily ascertainable class. A well-defined community of interest exists to warrant class wide relief because Plaintiff and Class Members were subjected to the same wrongful practices by Defendant, entitling them to the same relief.

58.     **Numerosity: Federal Rule of Civil Procedure 23(a)(1)**: The Classes are so numerous that individual joinder of their members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, Plaintiff is informed and believes that there are at least one million Class Members. Those individuals' names and addresses are available from Defendant's records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

59.     **Commonality: Fed. R. Civ. P. 23(a)(2) and (b)(3)**.  Consistent with Rule 23(a)(2)

and with 23(b)(3)'s predominance requirement, common questions of law and fact exist as to members of the Classes and predominate over any questions which affect only individual members of the Classes. These common questions include, but are not limited to:

    a.   Whether and to what extent Defendant had a duty to protect privacy of Plaintiff and Class Members;

    b.   Whether Defendant had a duty not to disclose the data collected from Plaintiff and Class Members to unauthorized third parties;

    c.   Whether Defendant had a duty not to use the collected User Information of Plaintiff and Class Members for advertising purposes;

    d.   Whether versions of the iOS that required Plaintiff and Class Members to opt out of tracking and advertising violated Defendant's duty to Class Members or its Privacy Policy;

    e.   Whether Defendant had a duty not to use the collected User Information of Plaintiff and Class Members for sale to third parties as part of its advertising;

    f.   Whether Defendant engaged in various common law violations, including trespass and breach of implied contract;

    g.   Whether Defendant engaged in unfair, unlawful, or deceptive consumer practices by illegal collection of the User Information of Plaintiff and Class Members;

    h.   Whether Defendant engaged in unfair, unlawful, or deceptive advertising practices by illegal collection of the User Information of Plaintiff and Class Members;

    i.   Whether Plaintiff and Class Members are entitled to actual, damages, and/or statutory damages as a result of Defendant's wrongful conduct;

    j.   Whether Plaintiff and Class Members are entitled to restitution as a result of

Defendant's wrongful conduct; and

k.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the currently ongoing and unacknowledged harm faced as a result of Defendant's UI collection.

60.     **Typicality: Fed. R. Civ. P. 23(a)(3):** Consistent with Rule 23(a)(3), Plaintiff is a member of the Classes she seeks to represent, and her claims and injuries are typical of the claims and injuries of the other Class Members. Plaintiff's UI was collected by Defendant and was in possession of Defendant at the time of this complaint. Plaintiff's damages and injuries are akin to other Class Members and Plaintiff seeks relief consistent with the relief of the Class.

61.     **Adequacy: Fed. R. Civ. P. 23(a)(4):** Consistent with Rule 23(a)(4), Plaintiff will adequately and fairly protect the interests of other Class Members.  Plaintiff has no interests adverse to the interests of absent Class Members. Plaintiff is an adequate representative of the Classes because Plaintiff is a member of both of the Classes and is committed to pursuing this matter against Defendant to obtain relief for the Classes. Plaintiff has no conflicts of interest with the Classes. Plaintiff's Counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect Class Members' interests

62.     **Predominance & Superiority: Fed. R. Civ. P. 23(b)(3):** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate over individual issues because those issues discussed in the above paragraph on commonality are more important to the resolution of this litigation than any individual issues.  The purpose of the class action

mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Classes are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

63.     **Injunctive and Declaratory Relief**. Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant has acted or continues to act on grounds that apply generally to the Class Members, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. Injunctive relief is necessary to uniformly protect the Class Members' data, and to change Apple's business practices. Plaintiff seeks prospective injunctive relief as a wholly separate remedy from any monetary relief.

64.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

> a.   Whether Defendant owed a legal duty to Plaintiff and Class Members to maintain user privacy;
>
> b.   Whether Defendant made affirmative statements to Plaintiff and Class Members regarding its privacy practices;

c. Whether Defendant made material omissions to Plaintiff and Class Members regarding its privacy practices;

d. Whether Defendant made any statements to Plaintiff and Class Members regarding its privacy practices that were material;

e. Whether and how Defendant advertised its products to Plaintiff and Class Members regarding its privacy practices;

f. Whether Defendant used its software to harvest the UI of Plaintiff and Class Members without permission;

g. Whether Defendant used its hardware to harvest the UI of Plaintiff and Class Members without permission; and

h. Whether Defendant used Plaintiff's and Class Members' UI for profit.

65.     A class action is superior to other available means for fair and efficient adjudication of the claims of the Classes and would be beneficial for the parties and the court. Class action treatment will allow a large number of similarly situated persons to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require.  The amounts owed to the many individual Class Members are likely to be relatively small, and the burden and expense of individual litigation would make it difficult or impossible for individual members of the class to seek and obtain relief. A class action will serve an important public interest by permitting such individuals to effectively pursue recovery of the sums owed to them.

66.     **Risk of Prosecuting Separate Actions:** This case is appropriate for certification because class action litigation prevents the potential for inconsistent or contradictory judgments raised by individual litigation. Plaintiff is unaware of any difficulties that are likely to be

encountered in the management of this action that would preclude its maintenance as a class action.

## COUNT I
### Breach of Implied Contract
**(On Behalf of Plaintiff and the Nationwide Class and the New York State Class)**

67.     Plaintiff and the Classes re-allege and incorporate by reference herein all of the allegations contained in the previous paragraphs.

68.     Defendant solicited Plaintiff and Class Members to purchase iPhones, iPads, and other consumer electronics with visual commercials and print ads that emphasized the privacy of those devices and Apple's core commitment to privacy for consumers.

69.     Defendant told Plaintiff and Class Members that in purchasing Apple products; their privacy was assured.

70.     As discussed herein, Apple gave a myriad of examples of actions it defined as invading user privacy, which included the harvesting by others of UI and the removal of user data from Apple devices.

71.     In so doing, Plaintiff Class Members entered into implied contracts with Apple by which Defendant Apple agreed to not to engage in invasion of user privacy, not to harvest user date, and to safeguard users from third parties accessing their UI.

72.     A meeting of the minds occurred when Plaintiff and Class Members agreed to, and did, purchase Defendant's products, usually at a premium price, in exchange for, amongst other things, the protection of their UI.

73.     Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

74.     By its actions stated within, Defendant breached the implied contracts it made with Plaintiff and Class Members.

75.     By surreptitiously harvesting their UI and invading user privacy, Apple diminished the value of its products to Plaintiff and Class Members, who were ultimately the users of those products.

76.     As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and Class Members have suffered (and will continue to suffer) ongoing, imminent, and impending data theft, resulting in monetary loss and economic harm; loss of the confidentiality of the harvested confidential data; and other economic and non-economic harm.

77.     As a result of Defendant's breach of implied contract, Plaintiff and Class Members are entitled to and demand actual, consequential, and nominal damages.

## COUNT II
### Invasion of Privacy
**(On Behalf of Plaintiff and the Nationwide Class and the New York State Class)**

78.     Plaintiff and the Classes re-allege and incorporate by reference herein all of the allegations contained in the previous paragraphs.

79.     Plaintiff and Class Members had a legitimate expectation of privacy to their UI, and relied on and were entitled to the protection of this UI against the prying eyes of anyone.

80.     Defendant owed a duty to its customers, including Plaintiff and Class Members, to keep the integrity of its consumer devices as advertised and not gather the UI thereon, and to allow Plaintiff and Class Members to keep such UI confidential.

81.     Defendant failed to protect device integrity, and instead it collected UI of Plaintiff and Class Members.

82.     Defendant collected individual UI without authorization and without the knowledge of Plaintiff and Class Members and accessed and examined the UI of Plaintiff and Class Members for its financial gain.

83.     In so doing, Apple unlawfully invaded the privacy of Plaintiff and Class Members, and did so while publicly and unequivocally saying that it protected user privacy and would not do otherwise.

84.     The unauthorized taking, custody of, and/or use Apple of the UI of Plaintiff and Class Members (especially in the face of the absolute promises of privacy as a human right Apple has made repeatedly and continues to make to do this day) is highly offensive to a reasonable person.

85.     The intrusion was into a device, place or thing, which was private, was advertised by Apple to be private, and is entitled to be private. Plaintiff and Class Members used their devices as part of Plaintiff's and Class Members' service relationships with Defendant, but privately with an intention that the UI would be kept confidential and would be protected from collection. Plaintiff and Class Members were reasonable in their belief that such information would be kept private and would not be taken or accessed without their authorization.

86.     The actions of Defendant constitute an intentional interference with Plaintiff's and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

87.     Defendant acted with a knowing state of mind when it accessed UI, because the resulting reporting of UI that occurred could only have been an act with intent and with actual knowledge of Apple.

88.     Because Defendant acted with this knowing state of mind, it knew its actions would cause injury and harm to Plaintiff and Class Members.

89.     As a proximate result of the above acts and omissions of Defendant, the UI of Plaintiff and Class Members was available to Apple without authorization, causing Plaintiff and

Class Members to suffer damages.  Plaintiffs are entitled to recover these damages.

90.     Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that the UI maintained by Defendant can be viewed, distributed, and used by Apple for years to come. Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and Class Members.

**COUNT III**
**Breach of Confidence**
**(On Behalf of Plaintiff and the Nationwide Class and the New York State Class)**

91.     Plaintiff and the Classes re-allege and incorporate by reference herein all of the allegations contained in the previous paragraphs.

92.     At all times during Plaintiff's and Class Members' interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiff's and Class Members' UI.  In fact, the confidential and sensitive nature of Plaintiff's and Class Members' UI is what makes it valuable and profitable for Apple.

93.     As alleged herein and above, Defendant's relationship with Plaintiff and Class Members was governed by terms and expectations that Plaintiff's and Class Members' UI would be protected in confidence and would not be disclosed to any parties.

94.     Plaintiff and Class Members used Defendant's devices and Defendant's services with the explicit and implicit understandings that Defendant would protect and not permit the UI to be accessed by any party.

95.     Defendant voluntarily received in confidence the UI of Plaintiff and Class Members with the understanding UI would not be accessed or disseminated to the public or any parties.

96. Due to Defendant's actions, the UI of Plaintiff and Class Members was taken by Apple and/or misappropriated to unauthorized third parties; beyond Plaintiff's and Class Members' confidence, and without their express permission.

97. As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiff and Class Members have suffered damages.

98. But for Defendant's access of Plaintiff's and Class Members' UI in violation of the parties' understanding of confidence, their UI would not have been compromised by any party, including Apple.

99. The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Defendant's unauthorized harvesting of Plaintiff's and Class Members' UI.

100. Defendant knew or should have known its methods of securing Plaintiff's and Class Members' UI was illegal and a breach of promise and confidence.

101. As a direct and proximate result of Defendant's breach of its confidence with Plaintiff and Class Members, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the breach of privacy of their Apple devices, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from user information theft and indeed the scope of that theft; (ii) costs associated with placing hardware and software with products that actually protect user privacy of UI; and (iii) the continued risk to their UI, which remain in Defendant's possession and is subject to further unauthorized use.

102. As a direct and proximate result of Defendant's breaches of confidence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm,

including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

103.    As a result of Defendant's breaches of confidence, Plaintiff and Class Members are entitled to and demand actual, consequential, and nominal damages.

## **COUNT IV**
### **VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW §349(a)-(h)**
### **(On Behalf of Plaintiff and the New York State Class)**

104.    Plaintiff and the New York State Class re-allege and incorporate by reference herein all of the allegations contained in the previous paragraphs.

105.    Plaintiff and the New York State Class are individuals who reside in New York and whose User Information was illegally taken by Defendant as described extensively in the preceding paragraphs.

106.    Plaintiff and the New York State Class are "persons" within the meaning of New York General Business Law ("GBL") § 349(h).

107.    GBL § 349(a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

108.    Defendant engaged in deceptive acts and practices in the form of material misrepresentations and omissions to consumers during the conduct of business with Plaintiff and the New York State Class violation of GBL § 349(a).

109.    As fully alleged herein, Defendant engaged in unfair and deceptive acts and practices in violation of GBL § 349(a); specifically, by stating that its devices would maintain user privacy, that on its computing devices you "control how your apps use your data,"[17] that on its

---

[17] Apple, Inc. (n.d.). *Privacy. Id.*

iPhone computing device "Learn about App Tracking Transparency on iPhone. A simple new feature that puts your data back in your control."[18]

110.    Apple advertises to New York consumers on billboards, the sides of buildings, and at the point of sale on its website and in brick and mortar store locations, as well as through mass media, social media, and the internet.

111.    Apple states proactively that "Every day, people go about their lives unaware that their personal information is being harvested." Reasonable consumers would be misled by this statement to believe Apple did not harvest their personal information.

112.    Apple knowingly made such misrepresentation to mislead consumers, thereby enabling it to gather this valuable information uninterrupted.

113.    Apple covered up its willful misrepresentations with, *inter alia*, options on its iPhone to make users believe their privacy was ensured, statements on their website stating "Privacy. That's Apple," and other affirmative acts to mislead consumers.[19]

114.    Apple's knowing misrepresentations caused Plaintiff and the New York State Class damages as previously described.  These damages are separate and distinct from any losses as the result of Defendant's breach of implied contract or breach of warrantee of merchantability and fitness of purpose.

115.    Apple also made material omissions regarding its use of UI for marketing and advertising purposes, and its continued harvesting and use of that information even in situations where Plaintiff and Class Members choose to opt out of tracking in IOS settings.

---

[18] *See supra* note 4.
[19] *Id.*

116.    Reasonable consumers would be misled by Defendant's material misrepresentations and/or omissions concerning their privacy.

117.    Had Plaintiff and the New York State Class known of Defendant's intention to collect and monetize their private information, Plaintiff and the New York State Class would not have purchased Defendant's devices.

118.    Had Plaintiff and the New York State Class known of Defendant's intention to collect and monetize their private information, Plaintiff and the New York State Class would not have purchased Defendant's devices at the premium price to other equivalent phones.

119.    As a direct and proximate result of Defendant's violations, Plaintiff and New York State Resident Class members suffered injury as comports with GBL § 349(h).

120.    Plaintiff seeks restitution on behalf of the New York State Class for statutory damages under GBL § 349(h).

121.    Plaintiff seeks actual damages in the amount of the disgorgement of the price premium paid to Defendant, on behalf of the New York State Class under GBL § 349(h).

122.    Because Apple made knowing misrepresentations to consumers, Plaintiff seeks restitution on behalf of the New York State Class for statutory treble damages under GBL § 349(h).

123.    As a direct and proximate result of Defendant's material misrepresentations and/or omissions to consumers concerning their privacy, Plaintiff and the New York State Class continue to suffer harm.

124.    Plaintiff and the New York State Class seek injunctive relief on behalf of New York Class members in the form of an order (1) compelling Defendant to cease and desist in harvesting of user data and (2) compelling Defendant to provide detailed and specific disclosure of what types

of User Information have been collected, who had access to that Information, and what Defendant used it for.

125.    Plaintiff and the New York State Class seek attorney's fees and any other lawful, statutory, or equitable damages to the fullest extent permitted under GBL § 349(h).

## COUNT V
### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
### (On Behalf of Plaintiff and the New York State Class)

126.    Plaintiff and the New York State Class re-allege and incorporate by reference herein all of the allegations contained in the previous paragraphs.

127.    Plaintiff brings this claim individually and on behalf of the New York State Class.

128.    Plaintiff and the New York State Class are individuals who reside in New York and whose User Information was illegally taken by Defendant as described above.

129.    Plaintiff and the New York State Class are "persons" within the meaning of and as defined by GBL § 349(h).

130.    GBL § 350 states: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

131.    False statements and omissions of material facts are covered under this statute.

132.    GBL § 350(a) states:

> representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.

133. Apple advertises to New York consumers on billboards, the sides of buildings, and at the point of sale on its website and in brick and mortar store locations, as well as through mass media, social media, and the internet.

134. As stated specifically within this Complaint, Apple has billboards stating, "What happens on your iPhone stays on your iPhone."

135. As stated above, Apple's website, the point of sale of much of its consumer business in New York and for New York residents, states affirmatively: "Privacy. That's Apple."

136. Apple's CEO Tim Cook has specifically stated this on NPR radio:

> We do think that people want us to help them keep their lives private. We see that privacy is a fundamental human right that people have. We are going to do everything that we can to help maintain that trust. …
> Our view on this comes from a values point of view, not from a commercial interest point of view. Our values are that we do think that people have a right to privacy. And that our customers are not our products. We don't collect a lot of your data and understand every detail about your life. That's just not the business that we are in.

137. Apple's statements are contrary to what researchers have found to be true, which is that Apple tracks, harvests, and profits off of customer UI even when requested not to do so .[20]

138. Apple's knowing misrepresentations caused Plaintiff and the New York State Class damages as previously described.  These damages are separate and distinct from any losses as the result of Defendant's breach of implied contract or breach of warrantee of merchantability and fitness of purpose.

139. Reasonable consumers would be misled by Defendant's material misrepresentations and/or omissions in Apple's advertising concerning their privacy.

---

[20] *See supra* note 10.

140.    Had Plaintiff and the New York State Class known of Defendant's intention to collect and monetize their private information, Plaintiff and the New York State Class would not have purchased Defendant's devices.

141.    Had Plaintiff and the New York State Class known of Defendant's intention to collect and monetize their private information, Plaintiff and the New York State Class would not have purchased Defendant's devices at the premium price to other equivalent phones.

142.    As a direct and proximate result of Defendant's violations, Plaintiff and New York State Resident Class members suffered injury as comports with GBL § 350.

143.    Plaintiff seeks restitution on behalf of the New York State Class for statutory damages under GBL § 350.

144.    Plaintiff seeks actual damages in the amount of the disgorgement of the price premium paid to Defendant, on behalf of the New York State Class under GBL § 350.

145.    Because Apple made knowing misrepresentations to consumers, Plaintiff seeks restitution on behalf of the New York State Class for statutory treble damages under GBL § 350.

146.    As a direct and proximate result of Defendant's material misrepresentations and/or omissions to consumers concerning their privacy, Plaintiff the New York State Class continue to suffer harm.

147.    Plaintiff and the New York State Class seek injunctive relief on behalf of New York Class members in the form of an order (1) compelling Defendant to cease and desist in harvesting of user data and (2) compelling Defendant to provide detailed and specific disclosure of what types of User Information have been collected, who had access to that Information, and what Defendant used it for.

148.    Plaintiff and the New York State Class seek attorney's fees and any other lawful, statutory, or equitable damages to the fullest extent permitted under GBL § 350.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Nationwide Class and the New York State Class and appointing Plaintiff and their Counsel to represent such Classes;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the collection and/or use of the UI of Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

   i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

   ii.    requiring Defendant to delete, destroy, and purge the UI of Plaintiff and the Class unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members; and

   iii.    requiring Defendant to meaningfully educate Plaintiff and the Classes about the scope of the loss of their UI, and its specific use.

D.    For an award of damages, including actual, consequential, nominal, and statutory damages, as allowed by law in an amount to be determined;

4861-4725-4098, v. 3

E.       For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.       For prejudgment interest on all amounts awarded; and

G.       Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

Date: February 28, 2023                    Respectfully Submitted,

                              _s/ Paul C. Whalen_____

                              PAUL C. WHALEN, ESQ.  [PW1300]
                              **THE LAW OFFICE OF PAUL C. WHALEN, P.C.**
                              768 Plandome Road
                              Manhasset, NY 11030
                              Telephone: (516) 426-6870
                              pcwhalen@pm.me

                              KAREN HANSON RIEBEL
                              (*Pro Hac Vice application forthcoming*)
                              KATE M. BAXTER-KAUF
                              (*Pro Hac Vice application forthcoming*)
                              **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
                              100 Washington Avenue South, Suite 2200
                              Minneapolis, MN 55401
                              Telephone: (612) 339-6900
                              Facsimile: (612) 339-0981
                              khriebel@locklaw.com
                              kmbaxter-kauf@locklaw.com

                              *Attorneys for Plaintiff and the Putative Class*